UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TORRANCE GRAHAM,

      Petitioner,

                             CASE NO. 4:09-CV-14822

v.                         JUDGE MARK A. GOLDSMITH

                             MAGISTRATE JUDGE PAUL J. KOMIVES

CAROL R. HOWES,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    D.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    E.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        2.    *Trial Counsel (Claims I-III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            a.  Failure to Remove Juror (Claim I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            b.  Failure to Object to Prosecutorial Misconduct (Claim II) . . . . . . . . . . . . . . . . . 16
            c.  Failure to Retain Expert (Claim III) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        3.    *Appellate Counsel (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    F.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . . . 23
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

\*      \*      \*      \*      \*

I.     <u>RECOMMENDATION</u>: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.    <u>REPORT</u>:

A.    *Procedural History*

1.     Petitioner Torrance A. Graham is a state prisoner, currently confined at the Lakeland Correctional Facility in Coldwater, Michigan.

2.     On June 9, 2005, petitioner was convicted of first degree murder, MICH. COMP. LAWS § 750.316; possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b; and possession of a firearm by a felon, MICH. COMP. LAWS § 750.224(f), following a jury trial in the Wayne County Circuit Court.  On June 23, 2005, he was sentenced to a mandatory term of life imprisonment without possibility of parole on the murder conviction, a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction, and a concurrent term of 1-5 years' imprisonment on the felon-in-possession conviction.

3.     Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.     THE TRIAL COURT'S FAILURE TO SUA SPONTE REPLACE A RENEGADE AND/OR MANIFESTLY RELUCTANT JUROR, WHERE THERE WERE TWO ALTERNATES IN THIS THREE-DAY TRIAL, WAS AN ABUSE OF DISCRETION WHICH DENIED MR. GRAHAM OF HIS CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY AND A FAIR TRIAL, IN CONTRAVENTION OF THE SIXTH AND FOURTEENTH AMENDMENTS, AND CONST. 1963, ART. 1, §§ 17, 20; FURTHER, MR. GRAHAM WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE DEFENSE COUNSEL FAILED TO SEEK REMOVAL AND REPLACEMENT OF THE JUROR.

II.     MR. GRAHAM WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO A FAIR TRIAL AND DUE PROCESS OF LAW THROUGH MISCONDUCT OF THE PROSECUTOR, WHICH CONSISTED OF IMPROPER ARGUMENT WITH MISCHARACTERIZATION OF LAW AND FACT; FURTHER, DEFENSE COUNSEL'S FAILURE TO OBJECT DENIED MR. GRAHAM OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

2

*See People v. Graham*, No. 263945, 2006 WL 3373039 (Mich. Ct. App. Nov. 21, 2006) (per curiam).

      4.      Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Graham*, 478 Mich. 929, 732 N.W.2d 911 (2007).

      5.      On May 27, 2008, petitioner filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising through counsel the following claims:

    A.    DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL BY COUNSEL'S SUBSTANDARD PERFORMANCE AT TRIAL.

        1.    MR. GRAHAM WAS DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE DEFENSE COUNSEL FAILED TO SEEK REMOVAL AND REPLACEMENT OF JUROR 13.

        2.    MR. GRAHAM WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE DEFENSE COUNSEL FAILED TO OBJECT TO THE MISCONDUCT AND IMPROPER ARGUMENT OF THE PROSECUTOR.

        3.    MR. GRAHAM WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE DEFENSE COUNSEL FAILED TO RETAIN A FIREARMS EXPERT.

    B.    DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL IN DEFENDANT'S APPEAL OF RIGHT BY FAILING TO RAISE THE ISSUE OF INEFFECTIVE ASSISTANCE OF COUNSEL BASED UPON TRIAL COUNSEL'S FAILURE TO RETAIN A FIREARMS EXPERT.

On September 2, 2008, the trial court denied petitioner's motion for relief from judgment, concluding that petitioner's first two trial counsel claims were barred by MICH. CT. R. 6.508(D)(2) because they were raised on direct appeal, and that petitioner failed to establish actual prejudice with

respect to his other claims as required by MICH. CT. R. 6.508(D)(3) because the claims were without merit. *See People v. Graham*, No. 05-000650-01 (Wayne County, Mich., Cir. Ct. Sept. 2, 2008) [hereinafter "Trial Ct. op."]. The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Graham*, 485 Mich. 862, 771 N.W.2d 768 (2009); *People v. Graham*, No. 288213 (Mich. Ct. App. Jan. 12, 2009).

6.     Petitioner, through counsel, filed the instant application for a writ of habeas corpus on December 11, 2009. As grounds for the writ of habeas corpus, he raises the four ineffective assistance of counsel claims that he raised in the state courts.

7.     Respondent filed his answer on June 29, 2009. He contends that petitioner's third trial counsel claim is barred by petitioner's procedural default in the state courts, and that petitioner's remaining claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the December 28, 2004, shooting death of Alvin Dorsey inside 6635 Seneca Street in Detroit. The evidence adduced at trial was accurately summarized in petitioner's brief in the Michigan Court of Appeals on direct appeal:

> Mr. Dorsey died as a result of two gunshot wounds to the head; one bullet entered the back of the head, and the other entered the right forehead; both bullets were recovered during the autopsy. Additionally, the body was extensively burned, post-mortem, as the house on Seneca had been set on fire after the shooting.
> Brenda McCurtis-Waites testified that she lived with her boyfriend in the house on Seneca in December, 2004, but the boyfriend was at that time in jail. The house was a "dope house" and she and others had been selling drugs off and on for about one year. Ms. Waites knew Mr. Graham, and saw him on December 28, 2004 when he came to visit; Mr. Graham's nephew was with him, but Mr. Graham sent the nephew to the gas station. Ms. Waites and Mr. Graham then "tooted a blow," or snorted some heroin. Ms. Waites had used heroin for years, but had no idea how much she ingested that day.

4

Ms. Waites said that Mr. Graham at that time mentioned some incident that had occurred earlier in the year, where something happened to Mr. Graham's son while he gambled at the house next door, and that Mr. Graham seemed upset; however, he was not upset at anyone specifically, and not to Mr. Dorsey, and Mr. Graham instead referred to "them." Ms. Waites said that Mr. Graham had a pistol, what appeared to be a .45 caliber revolver, at that time, and that as he held it he told her "Auntie [Ms. Waites' boyfriend was Mr. Graham's uncle], I still haven't forgotten what the did."[1] Mr. Graham's nephew returned from the gas station and the nephew and Mr. Graham left.

Ms. Waites said that Mr. Graham returned to the house several hours later, at about 2:30 AM. She did not see the revolver this second time Mr. Graham visited. Mr. Graham appeared to have a happy demeanor during this second visit, unlike his mood earlier.

Mr. Dorsey, whom she called "Stone," arrived at the house about 30 minutes before Mr. Graham arrived for the second visit. Mr. Dorsey lay on a couch, comprised of two car-seats, in the dining room. Dorsey, along with another man, "Juan" [Jawann Watts], sold drugs from the house and "ran" the house, but Ms. Waites did not think he was selling that night; Mr. Graham did not buy drugs at the house, because, Ms. Waites said, he usually brought his own. She did not see Dorsey with a weapon that night, but would not be surprised if he had one. She said Watts was at the house in the early hours, but left at about 12:30 AM.

Ms. Waites let Mr. Graham into the house; Mr. Graham's nephew came in a little later. Ms. Waites then went to her bedroom to watch TV; she said she heard a conversation between Mr. Dorsey and Mr. Graham, wherein Mr. Graham asked Mr. Dorsey if he wanted to smoke a blunt [i.e., a marijuana cigar], and Mr. Graham offered to buy the bag if Mr. Dorsey would buy the blunt. Dorsey, however, was tired and did not want to smoke a blunt. Ms. Waites heard no arguments or threats between the two men, but she heard Mr. Graham keep on insisting that they should smoke a blunt. Ms. Waites then heard gunshots; she first heard two, and heard Mr. Graham say "What are you reaching for?" and she then heard two more shots.[2] She did not come out of her bedroom, but instead told the men to cut it out; she thought they were shooting in the air, as Dorsey and some others had done in the house some days earlier. Ms. Waites head Mr. Graham say "See you later, Auntie," and heard them leave out the back door, off the kitchen; that was the only door that was used

---

[1]Apparently, this referred to an incident earlier that year in which petitioner's son had been robbed at the house next door. *See* Trial Tr., dated 6/6/05, at 184-86, 210-11. There was some evidence that petitioner was specifically upset at Dorsey for the way he had spoken to petitioner's son. *See id.* at 213-14.

[2]In the interval between Dorsey's refusal and the shooting, petitioner said that he was going to get some marijuana from the car. He then left the house and returned shortly thereafter. *See* Trial Tr., dated 6/6/05, at 182, 187. Further, when petitioner stated "what are you reaching for," he said "uh, uh" as if he was making fun of Dorsey after having shot him. *See id.* at 239.

in the house. Ms. Waites came out of her bedroom and saw Dorsey on the floor; she could see blood around his buttocks, but she did not look closely at the body; she called to him but received no response. Ms. Waites said that it was very dark inside the house, because she liked to keep it dark inside; however, a bathroom light was on. She went back to her bedroom and then went out the window and went to the neighbor's house; she said she did not want to go through the house because she did not know if anybody else was there.

Ms. Waites said she went from the neighbor's front door to the back door several times trying to gain admission; she said while she was on the porch another neighbor came up and told her the house was on fire; Ms. Waites looked and saw flames coming from the kitchen window. Ms. Waites had not smelled any gasoline when she was at her house, and she had not seen anyone enter the house and pour gasoline; she was able to view the house the entire time when she was next-door trying to gain entrance to the neighbor's house.

Lemar Davenport, Jr., Mr. Graham's cousin, testified that he got off work at about 10:00 PM, and Mr. Graham called and wanted a ride. Mr. Davenport drove Mr. Graham to the house on Seneca; Davenport had been to the house before. Mr. Graham then asked Davenport if he could run to the store; Davenport bought the wrong kind of snacks, and had to return to the store a second-time; while there that second-time Mr. Graham called and asked if a man in a silver truck were there, and to give the phone to the man; Davenport gave the man, Watts, the telephone and Watts and Mr. Graham had a conversation. Mr. Davenport then picked-up Mr. Graham from the house on Seneca and drove to a Coney Island restaurant, where Mr. Graham met Watts and another person; after some minutes Davenport and Mr. Graham went back to the house on Seneca.

Davenport initially stayed in the car on Seneca Street, so that he could sleep; however, Mr. Graham came out and told him to come inside as it was not a safe neighborhood to sleep in the car. When Davenport went inside he saw Dorsey on the couch; Dorsey and Mr. Graham had a conversation. Dorsey said to Mr. Graham "What are you doing walking up on me this time of night, you could get popped." Davenport, who was very sleepy from having worked that day and from marijuana use, said he stood in the living room watching TV and he heard gunshots two to three minutes later, possibly ten shots in total; there were two shots, and then five to eight shots; he did not know who fired first; he saw Mr. Graham standing with a gun. Davenport said he had been in a daze, and blanked-out, and did not really hear, or was not aware of the first gunshot, until he heard the second gunshot. He had seen, through his peripheral vision, Dorsey sit up prior to the gunshots. Mr. Graham said "Let's go," and the two left; Mr. Graham drove Davenport's car. Mr. Graham told Davenport not to talk about it, but never told Mr. Davenport to lie. Davenport, who was Mr. Graham's cousin, had never known Mr. Graham to be violent.

Davenport testified pursuant to an agreement with the prosecution for use immunity. He admitted that he thought he could be charged with murder, and that the investigating officer told him he could tell her what happened, or he would be charged. Davenport said he tried to dig in his memory to get answers to keep the

officer happy.

Police witnesses found no physical evidence at the house (excluding, of course, Mr. Dorsey's body). The house was severely damaged. No guns or shell-casings were found. The officer-in-charge of the case, Karen Miller, testified that she never went to the scene, and never sent anyone back to look for any guns in the rubble, although she possessed a statement from Watts wherein he mentioned that he had earlier put and hidden a .38 in the attic ceiling.

Police Office Roger McGee, a K-9 handler, walked through the house with his dog searching for evidence of accelerants; the dog found several areas, and a portion of a Molotov cocktail at the bottom of steps leading upstairs from the kitchen.

Jawann Watts testified that he was 6' 5" tall, and that Dorsey, a childhood friend, had been 6' 4" tall. The Seneca house was a dope house which Watts and Dorsey ran; Brenda Waites lived there. Watts said on December 27-28, 2004, he went to the house at about 9:00 PM, but only stayed about five minutes; Mr. Graham, Mr. Graham's nephew, and Ms. Waites were there. Watts suggested to Mr. Graham that Graham buy him something to eat; Mr. Graham agreed and they later met at the Coney Island and Mr. Graham bought the food. Watts said he thought they left the restaurant at about 11:00 PM, and he then spent several hours with his girlfriend and went home at about 2:00 AM; he received a call at about 3:30 AM informing him of the events on Seneca and went to that area. Later that day he saw Ms. Waites, whom he described as an addict and user of heroin and cocaine, and let her know how heated he was about what had happened to Dorsey. Watts denied being at the Seneca house when it was set on fire.

Troy Mallette testified that he lived at 6629 Seneca, next-door to Ms. Waites, and that she came to his house in the early hours of December 28th. Mallette said Ms. Waites was in the basement speaking with someone when a neighbor came by and informed them that Ms. Waites' house was on fire.

Mr. Graham testified at the trial. He admitted to being an avid marijuana user, and recreational user of heroin. Mr. Graham had been out-of-town for two days, and returned in the evening of 12/28/2004. He wanted to buy some marijuana from Watts, and called Davenport for a ride. Davenport picked him up at about 10:30 - 11:00 PM and drove him to the house on Seneca. Mr. Graham gave Ms. Waites some money so she could buy herself some drugs, but was unable to get the marijuana from Watts, who could not get it just then. Mr. Graham later met Watts at the Coney Island and bought him some food, and then Mr. Graham and Davenport went to another house to smoke some marijuana. Later, Davenport and Mr. Graham returned to the house on Seneca after receiving a call from Watts to meet there; Mr. Graham drove because Davenport was high. Mr. Graham admitted that he had a gun, which he carried for protection, as he had previously been robbed and shot at.

When he returned to the house on Seneca, Mr. Graham found it pitch-black inside; he heard Dorsey say "I should pop you." Mr. Graham was concerned for his safety, and he did not know where Watts was, although Watts' truck was parked outside. Mr. Graham then heard a volley of shots, coming from somewhere at the

> back of the house; he could see the fire from the shooting; Mr. Graham testified that he was afraid for his life and returned fire; he did not know if anyone had been hit by the bullets.
>
> Mr. Graham said he had seen guns in the house on previous occasions, and had seen shotguns, .22 rifles, a 9 mm and .38s, in the possession of both Watts and Dorsey.

Def.-Appellant's Br. on Appeal, in *People v. Graham*, No. 263945 (Mich. Ct. App.), at 1-8 (citations to trial transcript omitted).

## C.      *Procedural Default*

Respondent first contends that petitioner's third claim is barred by petitioner's procedural default in the state courts, because petitioner failed to raise this claim on direct appeal. The Court decline to resolve petitioner's third claim on this basis. Even were the Court to conclude that petitioner's claim is procedurally defaulted, it is still necessary to consider the claim on the merits. Petitioner can still have his defaulted claims reviewed on the merits if he can show cause for, and prejudice attributable to, his default in the state courts. Petitioner contends that his appellate counsel was ineffective for failing to raise this claim on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claim, it is better to simply consider the merits of this claim, even if it is defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits

8

mirrored cause and prejudice inquiry).

D.     *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by

the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No.

104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997).

Amongst other amendments, the AEDPA amended the substantive standards for granting habeas

relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A

state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts

the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are

materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam)

(quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535

U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme]

Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's

resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Analysis*

Petitioner contends that he was denied the effective assistance of trial counsel in three respects.  Specifically, petitioner contends that trial counsel was ineffective for failing to: (1) remove a juror; (2) object to prosecutorial misconduct; and (3) retain a firearms expert.  Petitioner also contends that he was denied the effective assistance of appellate counsel by counsel's failure to raise on direct appeal his claim that trial counsel was ineffective for failing to retain a firearms expert. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*  With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See*

11

*id.* at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common

12

custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id*., at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.      *Trial Counsel (Claims I-III)*

a.  *Failure to Remove Juror (Claim I)*

Petitioner first contends that trial counsel was ineffective for failing to seek removal of a juror who had expressed an unwillingness to serve. This claim relates to Juror No. 13, Jeffrey Mies, who was both employed and a student at the time of trial. *See* Trial Tr., dated 6/6/05, at 16. During *voir dire*, Mies indicated that he "would sure like if I didn't get called today," *id*. at 71, and that serving on the jury was "not something that I'd like to do," *id*. at 72. Nevertheless, Mies repeatedly indicated, either explicit or implicitly through responses to questions about how he would judge the evidence, that he would decide the case fairly based on the evidence. *See id*. at 28, 60-64, 68-72. The following day, the trial judge placed on the record that he had "received a phone call from a person in the Jury Commissioner's Office indicating that this Juror No. 13 who had come down when we took our first break and expressed some dissatisfaction with being on the jury, indicating that he did not think that he should be on the jury, he was looking for a way out." *Id*., dated 6/7/05, at 7-8. The judge indicated that he had not spoken with the juror, and stated "I don't think that there's a problem. He just doesn't want to be on the jury[.]" *Id*. at 8. The prosecutor and defense

13

counsel indicated that Mies had come out of the jury room after the trial had concluded the previous day and talked with one of the court officers, and a court officer indicated that he approached some court officers after court had adjourned. *See id*. at 8-9. The court indicated that it did not want to "get into a big discussion with" Mies, reasoning that "it seems that he didn't, he doesn't want to be on the jury, he doesn't want to serve. I mean, he's qualified in all other ways except that he probably has something else he wants to do." *Id*. at 9. The court indicated its intention to instruct Mies that he is on the jury and that he was not to discuss the case with anyone, and defense counsel acquiesced in this course. *See id*. The court then instructed Mies, outside the presence of the other jurors: "I just want to make it clear to you that you are a member of the jury and I instructed all of the jurors before that you're not to discuss the case with any other people." *Id*. at 10. Mies indicated that he had not discussed the case with anyone, and that he understood he was not to talk to anyone about the case. *See id*.

The Michigan Court of Appeals rejected petitioner's claim that counsel provided ineffective assistance by failing to seek removal of Mies. The court reasoned:

> Defendant has failed to show that Juror 13's initial reluctance to serve on the jury prevented him from making a just and impartial decision. Although Juror 13 may have inquired into whether he could be relinquished from the jury panel, there is nothing in the record that shows that Juror 13 could not, or did not, perform his duties as promised. An attorney's decisions relating to the selection of jurors generally involve matters of trial strategy. Based on Juror 13's assurance that he would perform his job as expected, and the trial court's acceptance of his assurance, there is no reason why defense counsel should have opted to dismiss Juror 13 from the panel, or further inquired into a matter that the court and the attorneys deemed resolved.

*Graham*, 2006 WL 3373039, at *4 (quotation and citation omitted). This determination was reasonable.

"[J]ury selection is a process that inherently falls within the expertise and experience of trial

14

counsel." *Palacio v. State*, 511 S.E.2d 62, 67 (S.C. 1999) (citing cases). Because of this, counsel's decisions in the jury selection process are the type of strategic decisions which are particularly difficult to attack. *See Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989); *Cordova v. Johnson*, 993 F. Supp. 473, 530 (W.D. Tex.) (footnote omitted) (internal quotation omitted) ("Selecting a jury is more art than science. There is nothing unreasonable or professionally deficient in a defense counsel's informed decision to rely upon his own reading of venire members' verbal answers, body language, and overall demeanor[.]"), *aff'd*, 157 F.3d 380 (5th Cir. 1998). Here, petitioner has offered nothing to suggest that counsel's decision to keep Mies on the panel was anything other than trial strategy based on his assessment of Mies's ability to render a fair verdict. Accordingly, this Court should not second-guess counsel's judgment, and the court of appeals's failure to do so was reasonable.

Further, defendant cannot show that he was prejudiced by counsel's failure to remove Mies from the panel. In order to establish prejudice attributable to a counsel's failure to remove a juror, a defendant must show that the juror was actually biased. *See Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001); *Hughes v. United States,* 258 F. 3d 453, 458 (6th Cir. 2001); *Irons v. Lockhart*, 741 F.2d 207, 208 (8th Cir. 1984); *Parker v. Turpin*, 60 F. Supp. 2d 1332, 1362 (N.D. Ga. 1999); *Odle v. Calderon*, 919 F. Supp. 1367, 1389 (N.D. Cal. 1996). Here, defendant has offered nothing to demonstrate that Mies was actually biased against him. Mies repeatedly affirmed that he could decide the case based on the evidence, and would judge the evidence fairly. This Court should presume that these statements were truthful, and defendant has pointed to nothing to call into question the sincerity of Mies's assurance. *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (question in case of juror bias is whether juror swore "that he could set aside any opinion he might

hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed."); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir. 1987) (habeas relief not warranted on petitioner's claim of juror bias where juror stated he could be impartial despite his relationship with the victim). Indeed, nothing in the record even hinted that Mies was biased or could not fairly perform his duties. Rather, the record reflects that the trial court was simply faced with the not uncommon situation of a juror who would rather not serve. Mies's desire to avoid serving does not demonstrate bias. *See United States v. Angel*, 355 F.3d 452, 470 (6th Cir. 2004). Because Mies was not biased, petitioner cannot show that counsel was ineffective for failing to seeks Mies's removal, and petitioner accordingly is not entitled to habeas relief on this claim.

### b. Failure to Object to Prosecutorial Misconduct (Claim II)

Petitioner next contends that trial counsel was ineffective for failing to object to various instances of prosecutorial misconduct. Specifically, petitioner contends that the prosecutor misstated both the law and facts in his discussion of self-defense, and improperly vouched for the evidence. Petitioner argues that counsel was ineffective for failing to object to the prosecutor's comments.

With respect to the first prosecutorial misconduct issue, the prosecutor stated during closing argument:

> When you go outside of your house your, your rights to self-defense diminish, because at that point you now have a duty to retreat before you fire in self-defense or anger. Your first duty is to try to get away from danger. If someone is shooting in that house he could have ducked, he could have ran, he could have done other things before he shot back, and it's kind of funny, because according to him, he didn't even know who he was shooting at. It wasn't Alvin. Alvin didn't have a gun. He just told you that, I didn't see Alvin with a gun, so how can it be self-defense against Alvin?
> When you go into someone else's house, which Mr. Graham did, your right to self-defense is really, really low and you have to look at it very carefully, 'cause

16

> you come into someone else's place, someone else's home, someone else's castle and you start an argument with them and it gets out of hand, you pull your gun out and shoot them, you really have to look at the circumstances; is this really self-defense.
>
> \* \* \* \*
>
> Self-defense, one free shot and then you call 911. Here we have two shots to the head, direct, point-blank shots to the head.

Trial Tr., dated 6/8/05, at 107-09. Petitioner contends that this argument, suggesting a diminished right of self-defense, misstated the law, and that it misstated the facts because the medical examiner determined that a distance could not be determined.

The Michigan Court of Appeals rejected this claim. First, the court reasoned that "[a]lthough the prosecutor's choice of words, 'your rights of self-defense diminish,' may differ from the actual language of the law, the prosecutor did not misstate the law on self-defense." *Graham*, 2006 WL 3373039, at *2. The court explained that under Michigan law, a person outside the home has a duty to retreat before resorting to deadly force unless he faces a sudden, fierce, and violent attack or an attacker about to use a deadly weapon, that consistent with the prosecutor's statement "[t]hese exceptions require more urgency than a situation involving someone defending himself within his own dwelling." *Id*. Although petitioner quarrels with the court of appeals's interpretation of Michigan law regarding self-defense, "it is not the province of [this] habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, "[t]his Court is bound by the [Michigan] Court of Appeals's determination that the prosecutor did not misstate [Michigan] law on [self-defense]." *Eun Suk Joo v. Marshall*, No. CV 07-3418, 2008 WL 2051738, at *18 (C.D. Cal. May 09, 2008) (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)); *see also*, *Johnson v. Horel*, No. C 07-4483, 2010 WL 4722634, at *21 (N.D. Cal. Nov. 12, 2010); *Rudd v. Six*, No. 07-3097, 2008 WL 4372897, at *8 (D. Kan. Sept. 23, 2008). Because the state court determined that the prosecutor's comment was a proper statement of the law, counsel was not

17

ineffective for failing to raise a meritless objection.  *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995) (counsel not ineffective for failing to raise meritless objection); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993) (same).

Further, even assuming that the prosecutor's comment misstated the law, petitioner does not dispute that the trial court instructed the jury that the comments and arguments of counsel are not evidence, and provided a proper definition of self-defense under Michigan law.  *See* Trial Tr., dated 6/8/05, at 148 ("You must take the law as I give it to you.  If a lawyer said something different about the law follow what I say."); *id*. at 150 ("The lawyers' statements and arguments are not evidence."); *id*. at 157-59 (self-defense instruction).  Because the trial court correctly stated the law and admonished the jury that only its instructions on the law were to be followed, petitioner cannot show that he was prejudiced by the prosecutor's alleged misstatement of the law.  *See United States v. Wadlington*, 233 F.3d 1067, 1079 (8th Cir. 2000); *United States v. Gonzalez-Gonzalez*, 136 F.3d 6, 9 (1st Cir. 1998).  And it likewise follows that he cannot show that he was prejudiced by counsel's failure to object.

Nor can petitioner show that counsel was ineffective for failing to object to the prosecutor's comments on the basis that they argued facts not in evidence, because any such objection would have been futile.  While it is true that there was no direct evidence of an argument between petitioner and Dorsey, Waites testified that petitioner was upset in general on the night in question, and specifically upset at the way Dorsey had spoken to his son.  Further, as the court of appeals observed, "[a]lthough Davenport did not hear defendant and Dorsey argue, evidence was presented that showed that, before Davenport came into the house, defendant and Dorsey had their differences regarding smoking a blunt," including Dorsey's repeated rejection of petitioner's desire and

18

petitioner's repeated attempt to get Dorsey to smoke with him.  *See Graham*, 2006 WL 3373039.

As the court of appeals correctly observed, a prosecutor is free to argue permissible inference arising

from the evidence.  *See Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985); *Graham*, 2006 WL

3373039, at *3.  Likewise, the prosecutor's argument that petitioner shot Dorsey twice at point blank

range was a permissible inference from the evidence.  Although the medical examiner testified that

there was no indications on Dorsey's body which would allow a range to be determined, this did not

preclude the conclusion that the shots were fired at close range.  The medical examiner testified that

he was unable to perform any tests which would determine range, such as an examination for

stippling marks around the wound, because Dorsey's body was badly charred in the fire.  *See* Trial

Tr., dated 6/7/05, at 95-96.  However, the medical examiner also testified that the bullets traveled

in a downward trajectory, as would be the case if the shooter was standing and Dorsey was sitting.

*See id*. at 97.  Further, Davenport testified that at the time of the shots petitioner was standing next

to Dorsey, about 3-4 feet away.  *See id*. at 30.  Thus, the prosecutor's comment was a fair inference

from the evidence presented, and any objection by counsel would have been futile.

Petitioner also contends that the prosecutor improperly bolstered his case by arguing in

rebuttal:

> Ladies and gentlemen, the law of the land in Michigan says that the prosecutor has a right to investigate crimes, and when we do that we do it with an investigative Subpoena.  We bring witnesses in and we question them under oath.  There is a court reporter there.  That's why we have a transcript.  They're sworn to tell the truth and give us a statement.
>
> That information is confidential.  I cannot disclose it.  Mr. Evans wants to make you think I'm covering something up.  I can't disclose that information.  It's confidential.  Unless the Judge orders me to do so before a trial I have to hold onto that document.  I can't let anyone see it.
>
> The minute Brenda testified she disclosed those confidences on her own to you.  I immediately handed him a copy of that transcript.  That's the law.  That's how it works.  I followed the law.  I wasn't covering up anything.  I did what I was

>supposed to do.  I held the confidence, and when she divulged them I gave him the
>transcript.  That's how the law works. . . .
>
>       The police investigate.  They have an investigation going.  They receive
>certain information.  Based on that information they bring charges.  That's the way
>the system works.  Once the charges are brought the defendant comes before you, the
>jury.  You decide whether we've done our job or not.  That's your job.  That's how
>the system works.  We're not trying to cover up anything.  We're not trying to not
>disclose anything to you at all.  That's the way the system works.  So when the
>officers go out there, the evidence techs go out there and they look at all the scene,
>and there was a group of them, and when the Homicide detective goes out there and
>looks at all the scene, they don't find any guns, they don't find any bullets, they
>don't find any bullets outside the house.  According to the defense those bullets came
>from outside it.

Trial Tr., dated 6/8/05, at 140-41.

This comment was not improper.  During his closing argument, defense counsel repeatedly

attacked both the police investigation and the prosecutor's actions during trial.  Defense counsel

argued that the prosecutor "withheld things," Trial Tr., dated 6/8/05, at 112, and was "telling half

truths," *id*. at 119, and "wanted to keep [certain evidence] from" the jury, *id*. at 136.  Defense

counsel also repeatedly argued that the police had failed to fully investigate the case in several

respects.  *See id*. at 125-26, 130, 131-32, 135.  Although subsequently objected to, defense counsel

also informed the jury that the prosecutor had failed to list or call some witnesses.  *See id*. at 135.

Finally, counsel informed the jury that he "didn't get that investigator's, that transcript until [Waites]

took the stand."  *Id*. at 121.  In light of these comments, the prosecutor's rebuttal, which accurately

reflected the investigative subpoena process and the general investigative process by the police, was

not improper.  An important factor in judging the propriety of a prosecutor's comments is whether

the comment was "invited by or was responsive to the [closing argument] of the defense."  *Darden*

*v. Wainwright*, 477 U.S. 168, 182 (1986); *see also*, *United States v. Young*, 470 U.S. 1, 12-13 (1985)

(footnote omitted) ("If the prosecutor's remarks were 'invited,' and did no more than respond

substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."); *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994). The prosecutor's comments were a fair response to defense counsel's attack on the prosecutor's presentation and the police investigation. *See Thomson v. Trombley*, No. 06-12619, 2008 WL 4427790, at *20 (E.D. Mich. Sept. 30, 2008) (Cleland, J., adopting Report of Komives, M.J.). And because the prosecutor's comments were not improper, counsel was not ineffective for failing to object to those comments. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this ineffective assistance claim.

### c. Failure to Retain Expert (Claim III)

Finally, petitioner contends that counsel was ineffective for failing to retain a firearm expert. Petitioner contends that because there was no evidence as to the type of firearm involved in the shooting, and because petitioner testified that he was shot and returned fire with a .38 revolver, "trial counsel should have retained a firearms expert and reviewed the evidence. If, in fact, another caliber bullet, other than a .38, was involved, that evidence would have supported Petitioner's claim of self-defense." Pet'r's Br., at 32.

Petitioner's argument, however, is mere speculation, and fails to satisfy his burden of demonstrating counsel's ineffectiveness. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same). "Generally, a petition for habeas corpus relief based on counsel's failure to call witnesses must present this evidence in the form of the actual testimony by the witness or affidavits." *United States ex rel. Townsend v. Young*, No. 01 C 0800, 2001 WL 910387, at *5

21

(N.D. Ill. Aug. 8, 2001) (citing *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)); *see also*, *Pittman v. Florida*, No. 8:05-cv-1700, 2008 WL 2414027, at *12 (M.D. Fla. June 11, 2008). Here, petitioner has identified no specific experts, nor pointed to anything which suggests that such experts would have testified on his behalf. "Speculation about what an expert could have said is not enough to establish prejudice." *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997). Indeed, petitioner fails to explain what evidence an expert possibly could have provided in light of the fact the police were unable to recover any bullets or guns from the scene. In these circumstances, defendant has failed to meet his burden of establishing prejudice. *See Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002); *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001); *Tafaya v. Tansy*, 9 Fed. Appx. 862, 871, 2001 WL 557971, at *6 (10th Cir. 2001); *Dell v. Straub*, 194 F. Supp. 2d 629, 650-51 (E.D. Mich. 2002) (Friedman, J.).[3] Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

3.    *Appellate Counsel (Claim IV)*

Petitioner also contends that his appellate counsel was ineffective for failing to raise on appeal his claim that trial counsel was ineffective for failing to consult a firearms expert. In the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). As explained above, petitioner's claim that trial counsel was ineffective for failing to retain an expert is without merit,

---

[3]Because petitioner has failed to present any evidence reflecting the views of an actual expert who would have testified on his behalf and the nature of that testimony, the cases upon which he relies are inapposite. In each of these cases, the petitioner developed in state court, through documentary evidence or actual testimony, the expert testimony that counsel should have investigated and presented. *See Dugas v. Coplan*, 428 F.3d 317, 325-26, 334 & n.25 (1st Cir. 2005); *Butler v. Hosking*, No. 93-5976, 1995 WL 73132, at *4 (6th Cir. Feb. 22, 1995); *Sims v. Livesay*, 970 F.2d 1575, 1577-78 (6th Cir. 1992).

and thus he cannot show that his appellate counsel was ineffective for failing to raise the claim on direct appeal. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new

23

Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons explained above. Because there is no evidence that Juror No. 13 was biased, the resolution of petitioner's claim that counsel was ineffective for failing to seek this juror's removal is not reasonably debatable. Likewise, because it is clear that the prosecutor's comments were not improper, it is not reasonably debatable that petitioner has failed to establish that counsel was ineffective for failing to object to these comments. Finally, because petitioner has failed to present

any evidence showing that an expert could have presented testimony that would have supported his defense, the resolution of his related ineffective assistance claims is not reasonably debatable. Accordingly, the Court should deny petitioner a certificate of appealability.

G.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.    <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length

unless by motion and order such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the objections.

s/ Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated:  June 20, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 20, 2011.

s/Susan Jefferson
Deputy Clerk